1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   MICHAEL LORENZO JONES,                        No. C-03-00079 JSW (PR)

12            Petitioner,                          **ORDER DENYING PETITION FOR**
                                                   **WRIT OF HABEAS CORPUS**
13      v.

14   GEORGE GALAZA, Warden,

15            Respondent.
                                         /
16

17                              **INTRODUCTION**

18        Michael Lorenzo Jones, a prisoner of the State of California currently incarcerated at Solano

19   State Prison, has filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

20   This Court found that the amended petition, liberally construed, stated three cognizable claims under

21   § 2254 and ordered Respondent to show cause why this court should not grant the writ.[1]   Respondent

22   filed an answer addressing the merits of Petitioner's claims and Petitioner filed a traverse.  This order

23   denies the amended petition for a writ of habeas corpus on the merits.

24                          **PROCEDURAL BACKGROUND**

25        On September 8, 1999, a jury found Petitioner guilty of two counts of home invasion robbery

26   (Cal. Pen. Code §§ 211, 213(a)), two counts of assault with a deadly weapon or use of force likely to

27   cause great bodily injury (Cal. Pen. Code § 245(a)(1)) and one count of possession of stolen property

28

---

[1]        The Amended Petition, filed on the same day as the Order to Show Cause, contains a
fourth cognizable claim regarding Petitioner's right to confront witnesses.  The Order to Show Cause
is amended to include this claim, which both parties briefed.

United States District Court

For the Northern District of California

1 (Cal. Penal Code § 496(a)). In a bifurcated proceeding, the trial court subsequently found true that

2 Petitioner had suffered a prior strike and a prior serious felony conviction. On December 1, 1999,

3 the trial court sentenced Petitioner to twenty-one years in state prison. Petitioner appealed his

4 conviction to the California Court of Appeal, which, in an unpublished decision, affirmed

5 Petitioner's conviction and sentence on September 25, 2001. The California Supreme Court denied

6 the petition for review on December 19, 2001. On January 3, 2002, Petitioner filed a state habeas

7 corpus petition with the California Supreme Court, which was summarily denied on June 26, 2002.

8 Petitioner filed a federal petition for writ of habeas corpus on January 7, 2003. On March 19,

9 2003, Respondent filed a motion to dismiss the petition as unexhausted. Upon reassignment of the

10 case to this Court, on August 6, 2003, this Court denied Respondent's motion to dismiss and granted

11 Petitioner's request for "withdrawal and abeyance." On November 24, 2004, Petitioner sought leave

12 to file an amended petition, which was granted on August 8, 2005. After granting two motions for

13 enlargement of time to file an amended petition, on December 23, 2005, this Court directed the clerk

14 of the court to close the file. On December 29, 2005, Petitioner filed this amended petition and a

15 motion seeking reconsideration of the Court's denial of request for appointment of counsel. On

16 April 10, 2006, this Court directed the clerk to reopen the case file and to file the amended petition

17 and issued the Order to Show Cause. The government filed an answer on August 10, 2006.

18 Petitioner filed a traverse on December 28, 2006.

19 **STATEMENT OF THE FACTS**

20 Petitioner was tried with co-defendants West Bunnery, Jr., Leonard Earl Green and Donna

21 Lynne Clavaud. The facts of the case are summarized from the California Court of Appeal's opinion

22 as follows:

23     The assaults and robberies occurred after 7:00 p.m. on February 2, 1999, at a
two-bedroom house at 1014 Sunset Avenue, in Santa Rosa, and within 15 minutes,

24 police had stopped a car holding all four defendants plus goods taken from the house.
Only Bunnery attacks the sufficiency of the evidence, his challenge being essentially

25 to whether he was a participant in the robbery or just a passenger in the car.

26     Juan Rodriguez, Isodoro Camerena and Juan Mondragon lived at the house
and were home that night with a visitor, Adolfo Moya, when there came a knock at

27 the door. Moya was on the telephone, and Camerena was in the bathroom. (Neither
Mondragon nor Camerena testified.) Rodriguez opened the door and saw a Black

28 man, identified at trial as Green. The porch light was off, and Rodriguez did not
notice anyone else. He asked what Green wanted, got no answer, and turned to the

others inside for help.

Two men entered, one after the other. The first grabbed Rodriguez and pushed him face-down onto the floor of the living room. The men forced his two companions to the floor, too, and beat them all. He knew the intruders were Black but was unable to see their faces from his position on the floor. Green, who he had seen "really well when he knocked," was not one of them, and he assumed Green stayed outside as a lookout. Then Rodriguez was hit in the back of the head (with a dining room chair, he learned later). He lost consciousness and saw nothing further. At the trial, he did not recognize anyone as having entered the house, but his preliminary hearing testimony (admitted by stipulation) was that one of the men was Jones. He did not recall so testifying, seeing or hearing a woman, or seeing any man enter who was bald or wearing a plaid shirt. He explained: "I didn't see them. I just saw the person who knocked in the door. He did have hair." (He was unable, two days after the event, to identify anyone from a photo lineup containing pictures of Jones and Bunnery).

Moya, on the phone, heard the knock at the door and did not have a chance to see the intruders or their clothing (except for black shoes or boots) before one put a hand over his mouth and pushed him to the floor. Then he was kicked once in the face, once in the ribs and stabbed three times - twice in the back and once in the right leg. The intruders demanded, in English, that the victims get on the floor and give them money. [footnote omitted]. After the attack, Moya noticed Rodriguez lying on the floor off to his side, his head injured.

The intruders took a VCR, a videotape inside titled "El Judicial," Rodriquez's wallet (bearing a circumscribed Mexican flag and man kicking a ball) with $30 to $40 and three Mexican bills), and Moya's watch.

The third victim, Mondragon, did not testify, but an officer testified seeing him with stab wounds in the back and shoulder. Camerena, the one in the bathroom when the intrusion began, did not testify either, but his actions were related by next door neighbor Francisco Cabrera, age 14, who testified that Camerena (also known to him as Alejandro Contreras) came over, said there were three Black men at the house and asked him to call the police. Cabrera called "911" and related information from Camerena that a black car drove by the two houses, stopped in front of 1014 Sunset and drove off with its lights off. (Camerena later told an officer he saw three Black men in the car as it drove past him; Cabrera's mother later told an officer her son spoke of seeing three people run from 1014 and get into a white car.) Santa Rosa police were dispatched to the scene at 7:22 p.m.

At 7:35 p.m., California Highway Patrol (CHP) Sergeant Eduardo Rodriguez was patrolling on Highway 101 and, having heard a BOL (be on the lookout) broadcast for the crimes describing a white Pontiac-type car, spotted a white Ford Thunderbird parked at the pumps of a Pit Stop gas station at the Todd Road exit. This was 4 or 5 miles, and a 10-minute drive, from the reported crime scene. Seeing two Black men standing by the Thunderbird (one removing a jacket) and a third person inside, Rodriguez drove to the next off-ramp, circled back and pulled his marked car behind the Thunderbird just as it left the pumps. It had three Black male passengers and a White woman driver. He followed without lights or siren on, for no more than half a mile, until the car turned onto Mountain View Avenue, a side street, and then into a residential driveway. CHP Officer Amy Roth had arrived as backup by then, and the two officers stopped their cars behind the two-door Thunderbird. After Santa Rosa officers arrived, the suspects were ordered out of the car one by one. Clavaud was the driver, Green was the front passenger; and Bunnery and Jones were the left and right rear passengers. A narrow-blade, wooden-handled knife lay in view on the

3

rear left window deck, behind where Bunnery sat, and Green and Jones had what appeared to be blood on the palms and backs of their hands. Jones wore house slippers.

The Thunderbird was impounded, searched and found to contain fruits of the robberies. On the left rear floorboard (at Bunnery's feet) were the VCR, the videotape, Mexican currency, and some white powder. Stuffed in the crack between the bench and back of the rear seat, a few inches apart, were a 20-peso bill, a plastic wallet sleeve holding Moya's ID, and a Ziploc bag containing just under half an ounce of cocaine. The bag was torn and seemed to account for more white powder found on the left rear floorboard. On the right rear floorboard were a small kitchen knife and a slipper. In the pocket of a women's brown leather jacket draped over the back of the front seat was Moya's black billfold, holding ID, voter information, three $2 bills and two Mexican coins. Clavaud's purse, on the left front floorboard, had a leather bifold wallet just inside containing a 20-peso bill; some $2 bills were also found in an envelope (not in the wallet). In the trunk was a black fanny pack containing ID and membership cards from Bunnery plus a glass vial of liquid that tested positive for cocaine; also there were a black and red jacket and a pair of black Nike tennis shoes, ownership unknown. There was blood on the rear seat.

In a patrol car on the way to the police station, Jones told an officer there was a large amount of cocaine in the car, in a clear plastic bag, that he did not know where or whose it was, and that everyone in the vehicle used crack cocaine. He and Green told an officer that they had flagged the car down for a rider; Bunnery similarly stated that while with Clavaud, he was flagged down by the two. Green, who had a fresh scrape or open wound on one knuckle of his right hand, said he had been in a fight, and Jones said that he and Green had stayed in the car while Bunnery went into the house alone. Bunnery, who was bald-headed and who wore a plaid shirt, blue jeans and brown shoes upon his arrest, told police he had worn those clothes all day. Bunnery also denied being present at the robbery, claimed to have been with Clavaud all day, and said they had picked up Jones and Green shortly before the arrest.

Officers at the house saw apparent blood on the floor just inside the entry and near the dining room table. There was also blood on the left rear leg of a dining room chair, and latent fingerprints forming a gripping pattern on a front leg proved to be from Jones.

At 8:00 p.m. the night of the incident, Deputy Michael Coates had heard the BOL and was parked at Stony Point and Todd Roads, five or six miles from the Sunset house, when a Black man named William Bryant, Jr. approached to report having been assaulted by three men. He also spoke about it later that night with Officer Jack Kilbride. Bryant had a puffy and bloodied lip, a full bushy beard and mustache, a bushy Afro, and wore a dark green jacket and possibly black work boots. He said that while at Juilliard Park, he had gotten into a small, two-door, white car occupied by three guys, and that they asked him to help them rob a drug house and, when he refused, beat him up and threw him out of the car. An address he gave (1869 Craig Road) proved to be nonexistent. Bryant had been discounted as a suspect during the police investigation, in part because of his beard, a feature not been [sic] described by witnesses. There was initial uncertainty in the trial testimony as to whether the three assailants reported by Bryant were Black or White. During trial, however, a prosecution investigator was able to locate Bryant from police records (at 616 Craig Avenue) and interviewed him. Bryant reported to the investigator that his assailants were White and that there was no woman in the car with them.

Defense testimony revealed narcotics activity at 1014 Sunset Avenue preceding this incident by months and existing afterward. A narcotics investigation

4

into methamphetamine supplying by occupant Alvaro Cazares (husband of Grizelda Garibay) led in early November 1998 to Cazares' arrest and the recovery of cocaine and heroin, a cutting agent, and over $8,000 in cash from the house and yard. On February 6, 1999, four days after the events here, officers recovered a stolen VCR from the house, which was by then virtually devoid of furnishings there days earlier. Present were men named Adolfo Moya Alvarez and Isodoro Camerena Romero, and a Juan Mondragon may also have lived there. Sheriff's Deputy Joe Raya, who was familiar with the earlier and later investigations, opined that narcotics were being trafficked through the house for sale elsewhere.

Clavaud was the only defendant to testify, and she claimed to have been with Bunnery, uninvolved in the crimes, and implicated only because they gave a lift to Green and Jones just before being stopped. She and Bunnery spent the night before at a friend's apartment. (The friend, a junior college assistant instructor, testified.) They did laundry and ate breakfast before leaving around 11:00 o'clock the next morning in the Thunderbird, which she was in the process of buying from her brother. They went to an auto supply store, and Clavaud applied for disability, before they went to a charity soup kitchen for lunch and then spent the afternoon playing Frisbee in Doyle Park and enjoying the day and sunset near Santa Rosa Creek. Although staying with friends at the time, she claimed to own a large, successful design/manufacturing firm in Petaluma and that she had a permanent residence in Tomales. She and Bunnery had about $20 between them.

Needing gas and cigarettes, she drove them to Berry's Market on Todd Road but never got inside because, upon entering the store lot, they were hailed by two men she did not know (Green and Jones). They asked for a ride to South Park, and Clavaud agreed after Bunnery said he knew one of them from school. The riders got into the back seat. They wore dark clothes and seemed to have been drinking. One of them (Jones) carried a big, fluffy, black down jacket under one arm. Clavaud had her own brown leather jacket, and a second jacket, draped over the front driver's seat. Bunnery was in front with her.

Jones offered gas money, and when Clavaud drove to the Pit Stop, one of the riders in back gave her a $10 bill. She went inside to the cashier and used it to buy $5 worth of gas and a pack of cigarettes. She came out, pumped the gas and went back to buy a can of "211" beer with the change. Green had gone inside, too, and when Clavaud returned to the car, Jones and Bunnery were inside it. Green soon returned and got into the front passenger seat, saying he would give her directions to South Park.

As Clavaud pulled away from the pumps, she noticed a CHP car following her but thought little of it until she got to Mountain View and noticed another. She pulled into a driveway to see what was the matter, and whether the cars would pass by. No one in the car appeared nervous or panicked. She pulled her driver's license from a side pocket of her purse. Then came blinding lights and the stop. She was the first one ordered out and left her purse and jacket behind.

Clavaud denied any knowledge of the VCR, videotape, knives, slipper, drugs or even the wallets and contents found in her jacket and purse (except the $2 bills, which she said she collected). Her implied theory was that all the unfamiliar items were brought into the car by Green and Jones, who then covertly stashed some in her purse and jacket. She said they brought into the car a red and white basketball found there. She recognized the fanny pack from the trunk as Bunnery's but did not know about the cocaine vial inside and denied using drugs.

In jury argument, Clavaud's counsel (last to argue) offered that whatever had

5

happened at the house - maybe a dispute or drug "ripoff" - his client and Bunnery were unaware and uninvolved; Green and Jones must have stashed loot in the purse and jacket once the CHP arrived, and stashed other loot, including the bag of cocaine, in the back seat area. Counsel noted that Bunnery had not been in the back seat until he moved there at the Pit Stop, and he speculated that Bryant was a third suspect who had a "third" wallet taken in the robberies. Clavaud was "just simply in the wrong place at the wrong time."

Counsel for Bunnery (first to argue) took a similar stance, urging that Clavaud was truthful, that "dope was involved," that Jones' reference to drug use was "a pre-emptive strike," and that robbery was "an occupational hazard" of drug sales at the house. As to cocaine and loot found around his client in the left rear seat, he urged that Bunnery was in the front until the Pit Stop, saw none of the stashed items and would not have though the VCR at his feet was stolen. No identification or prints implicated Bunnery; he was bald, a feature described by no witness; Bryant, who did have hair, was the likely third suspect and probably lied to police, for effect, about his assailants being three "white" guys; and the cocaine found in the vial in Bunnery's fanny pack was not a usable amount.

Counsel for Jones (second to argue), confronted the fingerprint evidence on the chair by urging that this was a drug house and that Jones had been there perhaps months earlier. He questioned how Jones could have had an opportunity to remove blood seen on his hands at the arrest yet not seen once he was at the police station. These victims were Hispanic drug dealers who, evidence suggested, "often changed their identities," and they were untrustworthy. Jones, who wore slippers, had gone with people to buy drugs, but his statement about cocaine being in the car showed that he did not know where it was and only knew that somebody had it.

Counsel for Green also sounded the drug-house, unreliable-witness and Bryant-as-perpetrator themes. He noted that his client had worn a full beard that night and was not eliminated as a suspect, whereas Bryant had been eliminated for that reason. He also noted that his client had not worn black boots as described by Moya.

Exh. D in Support of Answer to Order to Show Cause at 2-8.

## **STANDARD OF REVIEW**

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Under the 'contrary to' clause, a federal habeas court may grant the writ if a state court

6

arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if a state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. As summarized by the Ninth Circuit: "A state court's decision can involve an 'unreasonable application' of federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." *Van Tran v. Lindsey*, 212 F.3d 1143, 1150 (9th Cir. 2000) *overruled on other grounds*, *Lockyer v. Andrade*, 538 U.S. 63, 70-73 (2003) (citing *Williams*, 529 U.S. at 405-07).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411; *accord Middleton v. McNeil*, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must not only be erroneous, but objectively unreasonable); *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

In deciding whether a state court's decision is contrary to, or an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of the Petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). Where the state court gives no reasoned explanation of its decision on a Petitioner's federal claim and there is no reasoned lower court decision on the claim, a federal habeas court should conduct an independent review of the record. *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings of the Supreme Court as of the time of the state court decision. *Williams* 529 U.S. at

1 412; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). While the circuit law may be

2 "persuasive authority" for the purposes of determining whether a state court decision is an

3 unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are

4 binding on the state courts and only those holdings need be "reasonably" applied. *Id.*

5 In his amended petition for writ of habeas corpus, Petitioner asserts four claims: (1) his trial

6 counsel was ineffective for failing to seek severance of Petitioner's case; (2) his right to an impartial

7 jury venire was denied when the panel called was not a fair cross section of the community; (3) his

8 constitutional rights were violated by the prosecutor's exercise of peremptory challenges; and (4) his

9 Sixth Amendment right to confront witnesses was violated when preliminary hearing testimony of a

10 trial witness was read into the trial record.

## DISCUSSION

**1. Ineffective Assistance of Counsel**

13 Petitioner claims that he was denied effective assistance of counsel because his counsel failed

14 to seek severance of his case from those of his three co-defendants or to join in severance motions

15 made by co-defendants Bunnery and Clavaud. Am. Pet'n at 6-6A; Traverse at 3:8-11. The trial

16 court denied the severance motions made by Bunnery and Clavaud.

17 On appeal in state court, Petitioner argued that his defenses irreconcilably conflicted with

18 those offered by his co-defendants, so his counsel rendered ineffective assistance by failing to seek

19 severance. The California Court of Appeal disagreed, explaining:

> There is a statutory preference for joint trials of jointly charged defendants (§ 1098). "A 'classic' case for joint trial is presented when defendants are charged with common crimes involving common events and victims. [Citations.] Severance remains largely within the discretion of the trial court" (*People v. Keenan* (1988) 46 Cal.3d 478, 499-500), and may be granted where a defendant faces an incriminating confession by a codefendant, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant could give exonerating testimony (*id.* at p. 500; *People v. Hardy* (1992) 2 Cal.4th 86, 167 (*Hardy*)). Whether a trial court's denial of severance constitutes an abuse of discretion "is judged on the facts as they appeared at the time the court ruled on the motion." (*Hardy, supra,* at p. 167; *People v. Ervin* (2000) 22 Cal.4th 48, 68.) While the issue here is ineffective assistance, our inquiry similarly extends to the facts as they appeared *to counsel* (*People v. Coddington, supra,* 23 Cal.4th at p. 652) and on the prejudice side, of course, how the court might have viewed a motion to sever at that time.
>
> At the time of the motions as brought by Clavaud and Bunnery, this was a "classic" case for joint trial, with common charges involving common events and

**United States District Court**
For the Northern District of California

8

victims for the charges against Bunnery, Green and Jones. The court had just dismissed (§ 995) robbery and assault charges against Clavaud, leaving her charged with possessing stolen property and harboring (§§ 496, subd, (a), 32), but even those counts involved the same facts and victims. Further, the three counts of robbery alleged against Green, Jones and Bunnery (one count would be dismissed later at trial) were of in-home robberies done "in concert with two or more other persons" (§ 213, subd. (1)(a)(A)), thus making proof of three joint perpetrators essential to conviction.

Jones and Green rely *solely* on the conflicting-defenses rationale, but that strand is extremely narrow. "'Although several California decisions have stated that the existence of conflicting defenses may compel severance of codefendants' trials, *none has found an abuse of discretion or reversed a conviction on this basis.'* [Citations.] If the fact of conflicting or antagonistic defenses *alone* required separate trials, it would negate the legislative preference for joint trials and separate trials 'would appear to be mandatory in almost every case.' [Citation]

"Moreover, although it appears no California case has discussed at length what constitutes an 'antagonistic defense,' the federal courts have almost uniformly construed that doctrine very narrowly. Thus, '[a]ntagonistic defenses do not *per se* require severance, even if the defendants are hostile or attempt to cast the blame on each other,' [Citation.] 'Rather, to obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.' [Citations.] Stated another way, "'mutual antagonism" only exists where the acceptance of one party's defense will preclude the acquittal of the other.' [Citations.]" (*Hardy, supra,* 2 Cal.4th at p. 168; *Zafiro v. United States* (1993) 506 U.S. 534, 538 ["Mutually antagonistic defense are not prejudicial *per se*"].)

Green and Jones try to meet the test partly by examining jury arguments made by counsel at the close of trial, but this violates the rule that we must examine the situation as it appeared to counsel earlier, when it is claimed counsel should have sought severance or joined in the motions by Clavaud and Bunnery. Defense strategies commonly change during trial in response to testimony, rulings and the like, and jury arguments may or may not reflect counsel's earlier expectations. [fn. omitted]

As for those earlier expectations, Green and Jones do cite some pertinent material, particularly an affidavit in support of search warrant that reflects *Mirandized* statements they each made to police. Green claims no knowledge of why he had been arrested and that he and Jones had been picked up by Bunnery and Clavaud just minutes before the Thunderbird was stopped. He first disclaimed knowledge of any knife but then recalled handling one upon first getting into the car. He first said he had cut his lip boxing with Jones earlier in the day but then said this happened just before getting into the car, thus perhaps accounting for blood found in the car. Jones had disclaimed knowledge of things found in his pockets upon his arrest, and he, too, said he and Green had been picked up by Clavaud and Bunnery just before going to get gas. Bunnery had shown them some cocaine. Jones then changed his story "several times"; as to how he and Green came to be with Bunnery, for instance, he said they had met Bunnery at a park earlier in the day, before later hitching a ride with him. Jones, when told that he had been implicated in the robbery, then said he felt that Bunnery had "definitely" been involved. Then he denied committing the robbery but said he and Green had been outside the house, in the car, when Bunnery and another Black man (name unknown) went inside, ostensibly to buy cocaine. Bunnery emerged from the house upset that the other man had "fucked up" inside, and they all sped away together. The unnamed Black man got out of the car after they rounded a

United States District Court

For the Northern District of California

1

corner.

2

3

4

5

6

7

Green and Jones claim these "defenses" irreconcilably conflicted with those offered by Bunnery and Clavaud, but they cite no place in the record where we might glean what counsel would have understood the latter defendants' "defenses" to be at that point. Nor do those Defendants' written motions illuminate us, for they urged a need to sever based not on a showing of inconsistent defenses, but on *Aranda/Bruton* concerns (*People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123) should the statements by Green and Jones be admitted without the declarants testifying and being available to cross-examine. [fn. omitted]. (The court resolved this by ruling all statements inadmissible except as might be allowed in rebuttal, after a hearing (Evid. Code § 402).)

8

9

10

11

12

13

14

15

16

Based on their lack of record citations, then, Green and Jones fail to carry their burden of showing that their counsel should have felt that mutually antagonistic defenses furnished a meritorious ground for moving to sever. Also, if they *could* show counsel had reason to anticipate the defenses that Clavaud and Bunnery offered at trial, the claims of ineffective assistance would fail for two further reasons. First, Green and Jones fail to establish in their briefing how the *antagonism* rose to the extreme level needed to compel severance under *Hardy* and federal decisions (see, e.g., *United States v. Becker* (4th Cir. 1978) 585 F.2d 703, 707; see *Hardy*, *supra*, 2 Cal.4th at p. 170, fn. 20 [calling federal standards "similar to our state rule"]). Second, we could not tell, from this record, whether trial counsel for Green or Jones expected their clients to *adhere* to the pretrial statements or, instead, take the stand to offer other accounts. Further, the statements had been internally inconsistent, leaving room for variation, and experience teaches that defendants often take the stand to contradict or dispute their pretrial statements. Also, "contrary to defendant[s'] assertion, severance was not required merely because it [may have been] anticipated defendants would attempt to shift responsibility for the . . . crimes to each other." (*People v. Box* (2000) 233 Cal.4th 1153, 1196.)

17

18

19

20

Ineffective assistance of counsel is not shown. This was not a case of counsel overlooking the prospect of severance; each sat through the same pretrial hearings where Bunnery and Clavaud argued for it. The fact that these counsel did not seek severance strongly implies that they had tactical reasons, at that point anyway, for not doing so. Green and Jones each fail "to overcome the presumption that counsel's conduct [was] within the range of reasonably professional assistance." (*People v. Coddington*, *supra*, 23 Cal.4th at p. 652.)

21

Ex. D in Support of Answer to Order to Show Cause at 18-22.

### A.    Legal Standard

22

23

24

25

26

27

A claim of ineffective assistance of trial counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.*

28

To prevail on an ineffectiveness of counsel claim, Petitioner must establish two elements. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective

10

1  standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687-88;

2  *see also Wiggins v. Smith*, 123 S. Ct. 2527, 2536-37 (2003) (holding that the reasonableness of

3  counsel's decisions must be measured against the prevailing legal norms at the time of counsel's

4  representation). Under the first prong of the *Strickland* analysis, the relevant inquiry is not what

5  defense counsel could have done, but rather whether the choices made by defense counsel were

6  reasonable. *See Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). Judicial scrutiny of

7  counsel's performance must be highly deferential, and a court must indulge a strong presumption

8  that counsel's conduct falls within the wide range of reasonable professional assistance. *See*

9  *Strickland*, 466 U.S. at 689. Further, a difference of opinion as to trial tactics does not constitute

10  denial of effective assistance. *See United States v. Mayo*, 646 F.2d 369, 375 (9th Cir.), *cert. denied*,

11  454 U.S. 1127 (1981). In addition, trial counsel cannot have been ineffective for failing to raise a

12  meritless motion. *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005).

13  Second, Petitioner must establish that he was prejudiced by counsel's deficient performance,

14  i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of

15  the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is

16  a probability sufficient to undermine confidence in the outcome. *Id.* The test for prejudice is not

17  outcome-determinative, i.e., the defendant need not show that the deficient conduct more likely than

18  not altered the outcome of the case; however, a simple showing that the defense was impaired is also

19  not sufficient. *See Strickland*, 466 U.S. at 693. Where the defendant is challenging his conviction,

20  the appropriate question is "'whether there is a reasonable probability that, absent the errors, the

21  factfinder would have had a reasonable doubt respecting guilt.'" *Luna v. Cambra*, 306 F.3d 954, 961

22  (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 695).

23  **B.    Analysis**

24  The California Court of Appeal's rejection of Petitioner's claim of ineffective assistance of

25  counsel was not contrary to, or an unreasonable application of, applicable United States Supreme

26  Court precedent and did not amount to an unreasonable determination of the facts based on the

27  evidence presented in the state court record. *See* 28 U.S.C. § 2254(d). In order to assert a successful

28  ineffective assistance of counsel claim, Petitioner would first have to establish that counsel's failure

11

1 to move for severance or to join in Petitioner's co-defendants' motions to sever was objectively
2 unreasonable. Petitioner fails to meet this burden. Based on the evidence presented, the California
3 Court of Appeal found that Petitioner failed to carry his burden of showing that counsel would have
4 known that mutually antagonistic defenses provided a basis for severance because there was no
5 evidence as to what counsel might have thought the co-defendants' defenses were when a severance
6 motion would have been timely. *See People v. Hardy*, 2 Cal.4th 86, 167 (1992) ("Thus, antagonistic
7 defenses do not *per se* require severance, even if defendants are hostile or attempt to cast the blame
8 on each other.' [citation omitted] Rather, to obtain severance on the ground of conflicting defenses,
9 it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable, and
10 the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.") (internal
11 quotations omitted). The Court must presume the California Court of Appeal's factual
12 determinations in this regard are correct unless Petitioner rebuts the state court's findings with clear
13 and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Petitioner has not provided this Court with
14 any evidence whatsoever, much less clear and convincing evidence, to rebut the appellate court's
15 factual findings.

16      Even if Petitioner established that his counsel's performance was deficient, he would not be
17 able to establish prejudice because there has been no showing that there was a reasonable probability
18 that the result would have been different had counsel sought severance. Petitioner has not shown
19 how any antagonism among the defendants' defenses rose to the *Hardy* level. In fact, the trial court
20 denied Bunnery's and Clavaud's motions to sever, so it is not reasonably probable that a motion to
21 sever from Petitioner would have been successful. Further, the appellate court noted that there was
22 no evidence that Petitioner would testify as stated in the pretrial statements, or whether he would
23 offer another account of the events. *See People v. Box*, 233 Cal.4th 1153, 1196 (2000) ("contrary to
24 defendant[s'] assertion, severance was not required merely because it [may have been] anticipated
25 defendants would attempt to shift responsibility for the . . . crimes to each other."). Moreover, as the
26 appellate court pointed out, the decision not to pursue severance was likely a tactical decision that
27 cannot be the basis for an ineffective assistance of counsel claim. *See United States v. Mayo*, 646
28 F.2d 369, 375 (9th Cir.), *cert. denied*, 454 U.S. 1127 (1981) (holding that a difference of opinion as

1  to trial tactics does not constitute denial of effective assistance).

2      Therefore, it cannot be said that defense counsel rendered ineffective assistance. Petitioner is

3  not entitled to habeas corpus relief on his ineffective assistance of counsel claim.

4  **2.      Jury Selection Process**

5      Petitioner argues that he was denied a fair trial because the jury pool did not represent a fair

6  cross section of the community. Am. Pet'n at 6, 6B. He cites the statements of the court operations

7  manager for jury services in the record that there is no effort made to ensure that the jury pool is

8  representative of the ethnic composition of the community and that the jury commissioner's office

9  does not track what percentage of the County's population is African-American. RT 190.

10     **A.      Legal Standard**

11     A criminal defendant has a constitutional right stemming from the Sixth Amendment to a fair

12 and impartial jury pool composed of a cross section of the community. *See Holland v. Illinois*, 493

13 U.S. 474, 476 (1990); *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975); *Duncan v. Louisiana*, 391 U.S.

14 145, 148-58 (1968). The fair cross section requirement applies only to the larger jury pool or venire

15 and is not applicable to petit juries. *See Lockhart v. McCree*, 476 U.S. 162, 173-74 (1986); *Nevius v.*

16 *Sumner*, 852 F.2d 463, 463 (9th Cir. 1988), *cert. denied*, 490 U.S. 1059 (1989). So although the

17 Sixth Amendment guarantees that the petit jury will be selected from a pool of names representing a

18 cross section of the community, it does not require that petit juries actually chosen must mirror the

19 community and reflect the various distinctive groups in the population. *See Taylor*, 419 U.S. at 538;

20 *Lockhart v. McCree*, 476 U.S. at 173; *see also Harris v. Pulley*, 852 F.2d 1546 (9th Cir. 1988) (fair

21 cross section requirement does not apply to petit juries), *cert. denied*, 493 U.S. 1051 (1990).

22     In *Duren v. Missouri*, 439 U.S. 357 (1979), the Supreme Court held that to establish a *prima*

23 *facie* violation of the fair cross section requirement, a defendant must show that (1) the group alleged

24 to be excluded is a "distinctive" group in the community (*see, e.g.*, *United States v. Cannady*, 54

25 F.3d 544, 547 (9th Cir.) (African-Americans, Hispanics and Asians are distinct groups), *cert. denied*,

26 516 U.S. 878 (1995); *United States v. Fletcher*, 965 F.2d 781, 781 (9th Cir. 1992) (college students

27 not distinct group)), (2) the group was not fairly represented in the venire from which the petit jury

28 was chosen (*see, e.g.*, *United States v. Nelson*, 137 F.3d 1094, 1101 (9th Cir. 1998) (representation

United States District Court
For the Northern District of California

13

constitutionally sufficient where absolute disparity between proportion of Hispanics in the community and proportion of Hispanics in the jury pool was 3.9%), *United States v. Esquivel*, 88 F.3d 722, 726 (9th Cir. 1996) (requiring "absolute disparity" between number of persons from distinctive group in jury pool in relation to number of such persons in community and finding that 4.9% absolute disparity was insufficient to make out claim); *Cannady*, 54 F.3d at 548 (representation constitutionally sufficient where absolute disparity below 7.7%)), and (3) the underrepresentation resulted from a systematic exclusion of the group in the jury selection process (*see, e.g.*, *United States v. Miller*, 771 F.2d 1219, 1228 (9th Cir. 1985) (no systematic exclusion when only 30% of grand jury members and only 42% of venire were women absent showing that underrepresentation of women occurred generally in other venires)). *See Duren*, 439 U.S. at 367; *see also United States v. Herbert*, 698 F.2d 981, 984 (9th Cir.), *cert. denied*, 464 U.S. 821 (1983); *United States v. Berry*, 627 F.2d 193, 196 (9th Cir. 1980), *cert. denied*, 449 U.S. 1113 (1981). The government may rebut the establishment of a *prima facie* Sixth Amendment violation by showing that the systematic exclusion manifestly and primarily advances a significant state interest that is incompatible with the fair cross-section requirement. *See Duren*, 439 U.S. at 367-68. A Sixth Amendment *prima facie* case does not require a showing of discriminatory intent or that the defendant is a member of the excluded group, both of which are required for a *prima facie* case under the Equal Protection Clause. *See Esquivel*, 88 F.3d at 725-26.

A claim of systematic exclusion of members of a particular ethnic group from a jury panel can also support a violation of equal protection even where the number of members of the group in the relevant population is small. *See Castaneda v. Partida*, 430 U.S. 482, 494 (1977). To establish an Equal Protection Clause violation, a defendant must (1) establish that the group is a "recognizable, distinct class, singled out for different treatment under the laws, as written or as applied" (*see, e.g.*, *Esquivel*, 88 F.3d at 727 (Hispanics, although recognized as distinct class, not shown to be singled out for different treatment under the laws); *Walker v. Goldsmith*, 902 F.2d 16, 17 (9th Cir. 1990) (persons with surnames beginning with letters W through Z not recognizable class)), (2) prove the degree of underrepresentation (*see, e.g.*, *Cannady*, 54 F.3d at 548 (no *prima facie* case absent showing of statistical underrepresentation)), and (3) show that the selection

14

1   procedure is susceptible to abuse or is not racially neutral. *See Castaneda*, 430 U.S. at 494. In
2   addition, a defendant must show discriminatory intent. *See Thomas v. Borg*, 159 F.3d 1147, 1150
3   (9th Cir. 1998). The elements of a *prima facie* case depend on the circumstances of the individual
4   case. *See Hirst v. Gertzen*, 676 F.2d 1252, 1258-60 (9th Cir. 1982). A *prima facie* case could be
5   established by a showing of substantial underrepresentation or complete exclusion coupled with a
6   procedure for selection which is susceptible of abuse, *see id.* at 1259, or by a showing of the totality
7   of the circumstances, *see id.* at 1260. The government may rebut a *prima facie* equal protection
8   violation by proving the absence of discriminatory intent. *See Castaneda*, 430 U.S. at 495-496.

9          **B.     Analysis**

10         In this case, Respondent concedes that Petitioner has met the first prong of the *Duren* test
11  under the Sixth Amendment; there is no dispute that African-Americans are a distinctive group. *See*
12  *Cannady*, 54 F.3d at 547 (African-Americans, Hispanics and Asians are distinct groups). With
13  respect to the second and third prongs, however, Plaintiff's claim fails.

14         "The second prong . . . requires proof, typically statistical data, that the jury pool does not
15  adequately represent the distinctive group in relation to the number of such persons in the
16  community." *Esquivel*, 88 F.3d at 726. In determining whether a particular group is
17  underrepresented in a jury venire, the Ninth Circuit has adopted an "absolute disparity" analysis. *Id.*
18  The "absolute disparity" is determined by subtracting the percentage of the group in the jury pool
19  from that group's percentage of the relevant total population. *See id.* The figure for the general
20  population may be adjusted to reflect those who are actually eligible for jury service. *See id.* at 726-
21  27 (adjusting census figures for Hispanics in the general population to reflect only Hispanics over
22  age eighteen, the minimum for jury service); *see also United States v. Torres-Hernandez*, 447 F.3d
23  699, 705-06 (9th Cir. 2006) (holding that district court must exclude from figures for Hispanics in
24  general population those who are not eligible for jury service due to age and other reasons).
25  Statistical data must be presented to establish the disparity; the claim must be denied if the petitioner
26  lacks such evidence, even if the lack of evidence is attributable to ineffective assistance of counsel.
27  *Belmontes v. Brown*, 414 F.3d 1094, 1123-24 (9th Cir. 2005); *see, e.g.*, *Thomas*, 159 F.3d at 1151
28  (fair cross-section claim must be denied for lack of sufficient evidence even though part of the reason

United States District Court
For the Northern District of California

15

1   for the lack of evidence was caused by counsel's failure to challenge composition of jury panel prior
2   to trial and to preserve relevant statistics, which no longer existed).

3           Here, Petitioner has provided no evidence, statistical or otherwise, from which absolute
4   disparity can be determined. Petitioner's visual observation that the jury pool in his case contained
5   only one African-American does not satisfy the requirement to show that the pool did not adequately
6   represent African-Americans. There was no identification of the race of prospective jurors during
7   voir dire, and the juror questionnaire did not ask prospective jurors to identify their race, so there is
8   no record of the racial makeup of the jury pool. *Cf.* RT 176-77 ("The Court: And I have permitted
9   that question [about race] in other questionnaires, where relevant, to be asked of jurors. And I do not
10  believe that any attorney asked the Court to ask any of the jurors their ethnic background."). In
11  addition, Petitioner presented no proof of the total population of African-American citizens in
12  Sonoma County who are eligible for jury service. Moreover, the prospective jurors in this case
13  represented only a small portion of the master jury list from which the jurors were selected.
14  Petitioner argues, without citation to authority, that he should not have to provide the statistical
15  analysis of the ethnic makeup of the jury pool and the County because the jury commissioner should
16  have provided that information. However, the reason for the failure to provide sufficient evidence of
17  absolute disparity is immaterial. *See Thomas*, 159 F.3d at 1150-51. Petitioner has failed to meet his
18  burden under the second *Duren* prong to show absolute disparity.

19          Under the third prong, the disproportionate exclusion need not be intentional to be
20  unconstitutional, but it must be systematic. *See Randolph v. California*, 380 F.3d 1133, 1141 (9th
21  Cir. 2004). A showing of underrepresentation of an identifiable group is not alone enough to show
22  systematic exclusion under the third prong. *See id.* at 1141-42 (defendant failed to present probative
23  evidence that under representation of Hispanics was due to the system the county used to assemble
24  the venire).

25          Here, Francis Evans, the court operations manager for jury services, testified about the
26  County's method of selecting a jury pool. She testified that the master jury pool list is created twice
27  per year using information from voter registration records and Department of Motor Vehicles
28  records. RT 189. The list is screened to ensure that there are no duplicate names. RT 196. This

United States District Court
For the Northern District of California

16

method for preparing a master jury list is widely used and constitutionally valid. *See People v. Ochoa*, 26 Cal.4th 398, 427 (2001) (holding that master jury list drawn from voter registration and Department of Motor Vehicles records "shall be considered inclusive of a representative cross-section of the population where it is properly nonduplicative.") (internal quotations omitted) *cert. denied*, 535 U.S. 1040 (2002), *disapproved on other grounds in People v. Prieto,* 30 Cal.4th 226, 263, n. 14 (2003); Cal. Code Civ. Proc. § 197 (stating "list of registered voters and the Department of Motor Vehicles' list of licensed drivers and identification cardholders resident within the area served by the court, are appropriate source lists for selection of jurors. These two source lists, when substantially purged of duplicate names, shall be considered inclusive of a representative cross section of the population.").

Ms. Evans also testified that the information on the master jury list does not contain information as to race. RT 189, 209. The jury commissioner makes no special efforts to make sure that the jury pool is representative of the ethnic background of the community. RT 190. The jury commissioner's office does not keep statistics on the racial background of the jury panels. RT 201. To Ms. Evans' knowledge, no request has ever been made to the jury commissioner's office to determine the representation of different ethnic groups in the jury pool, and she had no information on the percentage of African-Americans in the County. RT 190, 193, 195. The jury commissioner's office does not exclude potential jurors of a particular race. RT 211. None of this evidence shows that African-Americans were "hindered in attempting to register to vote, discriminated against, barred from participating in jury venire or otherwise systematically excluded from the jury selection process." *United States v, Luong*, 255 F.Supp.2d 1123, 1128 (E.D. Cal. 2003), *aff'd* 393 F.3d 913 (2004), *cert. denied*, 544 U.S. 1006 (2005). Moreover, even if there was evidence of underrpresentation of African-Americans in the jury pool, that evidence, without more, is "an insufficient showing of systematic exclusion under the third prong of the *Duren* test." *Randolph*, 380 F.3d at 1141 ("If underrpresentation by itself were sufficient to support a holding of unconstitutionality, the second and third prong of *Duren* would effectively collapse into one inquiry."). Because Petitioner failed to present any evidence of systematic disproportionate exclusion of Afircan-Americans, he has failed to satisfy the third *Duren* prong.

17

1  Similarly, for these reasons, Petitioner has failed to establish a systematic exclusion of

2  African-Americans from the jury pool that would support an equal protection violation.  He has not

3  proven the degree of underrepresentation by any evidence, statistical or otherwise, or shown that the

4  selection procedure is susceptible to abuse or is not racially neutral.  Accordingly, Petitioner is not

5  entitled to habeas relief on his claim based on the jury selection process.

6  **3.    Peremptory Challenge**

7  Petitioner claims that the trial court violated his right to a fair and impartial jury when it

8  allegedly denied the challenge allegedly made by co-defendant's counsel, and joined by Petitioner, to

9  the use by the prosecutor of a peremptory challenge to exclude juror number 1054.  Am. Pet'n at 6.

10  Petitioner argues that the court erred in not reaching the *Wheeler* challenge on this issue.  Am. Pet'n

11  at 6, 6C; *see People v. Wheeler*, 22 Cal.3d 258 (1978) (holding that a party who believes his

12  opponent is using his peremptory challenges to strike jurors on grounds of group bias alone may

13  raise the point by way of a timely motion).

14

15  During jury selection, counsel for Defendant Bunnery made a motion challenging the jury

16  venire, stating:

17  > We have, as a group, had considerable concerns over the racial makeup of the
   > jury, the fact that we're down to almost our last juror before we run into, if my
18  > memory serves me, our first African-American.  It is because of that I think the
   > record will require us to make a challenge to the venire.

19

20  RT 172.  Petitioner joined in that motion.  RT 179.  This motion was not specifically brought under

21  *Wheeler*, which focuses instead on the prosecutor's misuse of peremptory challenges to exclude

22  jurors that are members of a specific ethnic group.  Counsel for Defendant Clavaud raised the issue

23  at the hearing on Bunnery's motion that the prosecutor improperly exercised a peremptory challenge

24  to remove the only African-American juror even though voir dire did not reveal any bias by this

25  juror.  RT 176.  But the trial court focused on Bunnery's "challenge to the jury selection process on

26  the basis that it does not contain a representative cross-section of the community" (RT 178) and

27  denied it, stating that the race of the jurors was unknown because the juror questionnaire did not ask

28  about race, nor were jurors asked about their race during voir dire.  RT 176, 177, 219-20.  The Court

stated:

1    And I have permitted that question [about race] in other questionnaires, where
     relevant, to be asked of jurors. And I do not believe that any attorney asked the
2    Court to ask any of the jurors their ethnic background. I do not think that it can be
     presumed that none of the other potential jurors were even partly, you know,
3    African-American just by viewing people. I think that's an absurd oversimplified
     view to do voir dire and understanding the very diverse makeup of the American
4    public.

5    So without – I will not accept that representation that you've just made [that there
     was only one African-American on the venire]. It is clear that juror 1054 who was
6    excused by the People had a very dark complexion. I – and obviously looked like
     an African-American, but I do not accept the proposition that there aren't – there
7    weren't any others.

8    RT 176-77. The Court concluded:

9    Well, I have reviewed a number of cases now in the area of what type of evidence
     the defendant would have to produce in order to prevail on a motion to challenge
10   the jury venire, and I do believe that the case of People versus Horton cited by the
     defendant in his moving papers at 11 Cal.4th 1068, states the current state of the
11   law as I'm bound to follow. It's a California Supreme Court case from 1995.

12

13   In that case, interestingly enough, they examine the jury selection process of a
     certain judicial district of Los Angeles and it described the third element of the
14   test that was previously described, even if there is underrepresentation, whether it
     is due to a systematic exclusion of the group in the jury selection process. And in
15   Horton, the defendant failed where there was evidence that – there was testimony
     that the method of selecting prospective jurors which explained that there was a
16   master list, comprised of the voter registration list as well as the Department of
     Motor Vehicles list of the persons holding driver's licenses or identification cards.
17   Those lists were merged to create a file of potential jurors. Questionnaires were
     sent. Et cetera, et cetera. No other efforts were made. And the Court essentially
18   held that if there was a disparity between the actual representation of basic ethnic
     diversity in the community and persons showing up for jury service, that wasn't
19   the result of any systematic effort essentially by the jury services. And the
     defendant does bear the burden of showing it's due to a systematic exclusion.

20

21   Conceivably this law could be changed in the future, but at present this represents
     the state of the law as it applies to this case. Therefore – and because I don't find
22   any evidence that the jury commissioner was served and the other three
     defendants who were allowed to join in technically didn't comply with the statute
23   in terms of providing notice in advance, except for joining in on the motion, but I
     did let them join. But in any event, for these reasons the motion will be denied.

24

25   RT 219-20. The trial court did not address the prosecution's peremptory challenge in making this

26   determination because Defendant Bunnery's motion was not directed at the prosecutor's conduct, but

27   instead at the racial makeup of the jury. Therefore, it was not error for the trial court to fail to

28   consider *Wheeler.* Moreover, the state court's rejection of Petitioner's claim regarding the challenge

     to the jury venire under *Horton* was neither contrary to, nor an unreasonable application of, clearly

United States District Court
For the Northern District of California

1  established United States Supreme Court law.

### A.  Legal Standard

The Sixth Amendment's fair cross section requirement does not prevent either side from exercising its peremptory challenges in order to exclude cognizable groups from a jury that is impaneled; the Sixth Amendment requires only an impartial, not a representative, jury. *See Holland*, 493 U.S. at 476-80. There is no violation of the Sixth Amendment right to a jury composed of a fair cross section of the community, for example, when a prosecutor uses his peremptory challenges to exclude potential African-American jurors based on permissible trial related concerns. *See Batson v. Kentucky*, 476 U.S. 79, 84 n.4 (1986); *Weathersby v. Morris*, 708 F.2d 1493, 1497 (9th Cir. 1983), *cert. denied*, 464 U.S. 1046 (1984).

The use of peremptory challenges by the prosecution to exclude cognizable groups from a petit jury may violate the Equal Protection Clause. *See Georgia v. McCollum*, 505 U.S. 42, 55-56 (1992); *Batson*, 476 U.S. at 89 (holding that the Equal Protection Clause forbids the challenging of potential jurors solely on account of their race). Under *Batson*, Petitioner must make out a *prima facie* case that the prosecutor exercised peremptory challenges on the basis of race "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 93-94, 96 (holding that a party establishes a *prima facie* case by showing that: (1) the defendant is a member of a cognizable racial group, (2) the group's members have been excluded from the jury, and (3) the circumstances of the case raise an inference that the exclusion was based on race). If the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. *Id.* at 97. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Id.* at 98; *Mitleider v. Hall*, 391 F.3d 1039, 1047 (9th Cir. 2004) (holding that to make this determination, the court must evaluate the prosecutor's proffered reasons and credibility under the totality of the relevant facts, using all the available tools including its own observations and the assistance of counsel).

//

*United States District Court*
*For the Northern District of California*

20

**B.    Analysis**

Defendant Bunnery's motion was not brought under *Wheeler* or *Batson.* Even if the motion to challenge the jury venire is construed as a motion under *Wheeler* or *Batson* challenging the peremptory exclusion of juror 1054, the state court's disposition was neither contrary to nor an unreasonable application of those cases. The California Supreme Court adopted the following test in *Wheeler* to determine when the exercise of peremptory challenges violates the constitutional jury trial right:

> If a party believes his opponent is using his peremptory challenges to strike jurors on the ground of group bias alone, he must raise the point in timely fashion and make a *prima facie* case of such discrimination to the satisfaction of the court. First, ... he should make as complete a record of the circumstances as is feasible. Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule. Third, from all the circumstances of the case he must show a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias.

*Wheeler*, 22 Cal.3d at 280 (fn. omitted); *see also People v. Johnson*, 30 Cal.4th 1302, 1309 (2003). The record contains no evidence from which Petitioner could make a *prima facie* showing of discrimination because there is no evidence of the racial makeup of the jury venire and there has been no showing of a "strong likelihood" that juror 1054 was challenged because of her group association. In fact, there is evidence that juror 1054 may have been excused for bias, rather than for any other reason, even though Juror 1054 stated that she could be impartial. *See* Augmented RT ("ART") 511-12, 518 (Juror 1054 had heard something about this case from her mother who goes to church with some of the people involved and who mentioned that the last name was Jones); ART 519 (Juror 1054 heard that "one of them was just coming home from the store, buying some milk, and they went by a garage sale and bought a golf club."); ART 522 (Juror 1054's mother's home had been broken into twice when the mother was not at home); ART 522-23 (Juror 1054's cousin was incarcerated in Sonoma County). For the same reasons, the circumstances of this case do not raise the inference of discrimination as required under *Batson* for an equal protection violation. Accordingly, Petitioner is not entitled to habeas corpus relief on this claim.

//

United States District Court
For the Northern District of California

1   **4.      Right to Confront Witnesses**

2          Petitioner argues that the trial court violated his right to confront witnesses by allowing the

3   prior preliminary hearing testimony of trial witness Juan Rodriguez to be read into evidence. Am.

4   Pet'n at 6D.  The trial court denied the prosecution's request to read prior testimony of an

5   unavailable witness into the record, but did allow the prosecution to read the prior testimony of trial

6   witness Mr. Rodriguez.  RT 732-34 (excluding prior testimony of Juan Mondragon); RT 1123-27

7   (allowing prior testimony of Juan Rodriguez).

8          **A.      Legal Standard**

9

10         A state court's evidentiary ruling therefore is not subject to federal habeas review unless the

11  ruling violates federal law, either by infringing upon a specific federal constitutional or statutory

12  provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process.

13  *See Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th

14  Cir. 1991); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985), *cert. denied*, 478 U.S. 1021

15  (1986).  The admission of evidence is not subject to federal habeas review unless a specific

16  constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the

17  fundamentally fair trial guaranteed by due process.  *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th

18  Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir.), *cert. denied*, 479 U.S. 839 (1986).

19         The Confrontation Clause of the Sixth Amendment provides that in criminal cases the

20  accused has the right to "be confronted with witnesses against him."  U.S. Const. amend. VI.

21  The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a

22  procedural rather than a substantive guarantee.  *Crawford v. Washington*, 541 U.S. 36, 61 (2004).  It

23  commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by

24  testing in the crucible of cross-examination.  *Id.*; *see Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) (a

25  primary interest secured by the Confrontation Clause is the right of cross-examination). For purposes

26  of federal habeas corpus review, the standard applicable to violations of the Confrontation Clause is

27  whether the inadmissible evidence had an actual and prejudicial effect upon the jury.  *See Hernandez*

28  *v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637

United States District Court
For the Northern District of California

1 │ (1993)); *Webb v. Lewis*, 44 F.3d 1387, 1393 (same). The Confrontation Clause does not bar the

2 │ admission of testimonial hearsay when the declarant appears for cross-examination at trial.

3 │ *Crawford*, 541 U.S. at 59 n.9 (citing *California v. Green*, 399 U.S. 149, 162 (1970)).

4 │ **B.    Analysis**

5 │
6 │ On August 30, 1999, the trial court allowed the prosecution to introduce as a prior

inconsistent statement the preliminary hearing testimony of Juan Rodriguez, who testified at trial.

7 │ The following exchange took place at trial regarding this issue:

8 │
9 │  Mr. Dunn [prosecutor]: . . . I am moving to introduce prior inconsistent testimony of a witness, that is, Juan Rodriguez. Juan Rodriguez testified in this trial that Mr. Jones was not present on the night of the robbery and that he did not identify Mr.
10 │  Jones at the preliminary hearing. Mr. Rodriguez did testify at the preliminary hearing to the contrary, and I'm offering his testimony at the preliminary hearing
11 │  as a prior inconsistent statement of that witness pursuant to Evidence Code 1235.
   │  ***
12 │
   │  The Court: All right. It does seem to be inconsistent.
13 │
   │  Mr. Stogner [Petitioner's trial counsel]: Your Honor, Excuse me, I'm certainly going to object to the introduction of that preliminary hearing testimony on a
14 │  number of bases.

15 │  First of all, in my view, the request is – well, to start with, I don't think the testimony is squarely inconsistent. I think that Mr. Dunn had ample opportunity
16 │  to question Mr. Rodriguez on the witness stand, and Mr. Rodriguez was quite clear that, although Mr. Jones was the same person here at trial that Mr.
17 │  Rodriguez had seen at the preliminary examination, he did notice that the hairstyle had changed. But he knew it was the same person and nevertheless indicated that,
18 │  in essence, that Mr. Jones was not the person he saw in the house.

19 │  I think the preliminary hearing testimony is hearsay at this point, and I – I don't believe that there's any exception to the rule. He was asked quite specifically on a
20 │  number of occasions whether or not Mr. Jones was someone he could identify, and he was even reminded of the preliminary hearing testimony through a couple
21 │  of different questions by Mr. Dunn, and he was unable to identify Mr. Jones. And I don't think that the preliminary hearing testimony is squarely inconsistent with
22 │  his testimony at trial.

   │  I think that the request is also, equally importantly, is untimely for a couple of
23 │  different reasons. One is it deprives Mr. Jones' counsel of cross-examining Mr. Rodriguez concerning any identification he may have made at the preliminary
24 │  examination.

   │  The Court: Why? He [Rodriguez] hasn't been - he is subject to recall, isn't he?
25 │
   │  Mr. Dunn: Yes, I specifically asked that he be subject to recall.
26 │  ***

27 │  The Court: It does appear to the Court that the requirements of Evidence Code 1235 and 770 have been met, Mr. Stogner, because the witness has not been
28 │  excused from giving further testimony in the action. So if you wish to recall him in your case, you're entitled to do so.

*(left margin)* United States District Court — For the Northern District of California

23

RT 1123-25. The Court concluded that permitting the introduction of the preliminary hearing testimony was not unduly prejudicial pursuant to Evidence Code § 352. RT 1128.

Because Mr. Rodriguez testified at trial, was cross-examined and was subject to recall for additional cross-examination, Petitioner's rights under the Confrontation Clause were not violated when the trial court permitted Mr. Rodriguez's prior testimony to be read into the record. *Crawford*, 541 U.S. at 59 n.9 (citing *California v. Green*, 399 U.S. 149, 162 (1970)). The state court's rejection of Petitioner's claim under the Confrontation Clause was neither contrary to, nor an unreasonable application of, clearly established United States Supreme Court law. Accordingly, Petitioner is not entitled to habeas corpus relief on this claim.

## 5. Fourth Amendment

The Amended Petition for Writ of Habeas Corpus contains an addendum entitled: "4th Amendment issue/argument joined as coappellant," and containing pages 23 through 32 of an opening brief filed with the California Court of Appeal. This section of the appellate brief argues that the arrest and detention of Defendants violated the Fourth Amendment because the officers lacked articulable suspicion to stop the Thunderbird, and that the trial court erred in excluding evidence that the officers drew their weapons in making the stop. Petitioner makes no Fourth Amendment claim in the body of the Amended Petition. Nor does he brief it in his Traverse.

Federal habeas review of Fourth Amendment claims is barred unless the state did not provide an opportunity for full and fair litigation of those claims. *Stone v. Powell*, 428 U.S. 465, 481-82, 494 (1976). The existence of a state procedure allowing an opportunity for full and fair litigation of Fourth Amendment claims, such as the California state procedure, rather than a defendant's actual use of those procedures, bars federal habeas consideration of those claims. *See Gordon v. Duran*, 895 F.2d 610, 613-14 (9th Cir. 1990) (whether or not defendant litigated Fourth Amendment claim in state court is irrelevant if he had opportunity to do so under California law).

Here, the California Court of Appeal extensively reviewed, and then rejected, the defendants' arguments that the police officers lacked reasonable suspicion to stop the Thunderbird and that the

24

1  trial court erred in excluding evidence of whether the officers drew their weapons. Ex. D. in Support

2  of Answer to Order to Show Cause at 8-17. Not only did Petitioner have a full and fair opportunity

3  to litigate his Fourth Amendment claim, that claim was actually litigated. Therefore, to the extent

4  that Petitioner makes a Fourth Amendment claim in his Amended Petition, habeas corpus relief as to

5  that claim is denied.

## CONCLUSION

After a careful review of the record and pertinent law, the petition for writ of habeas corpus is

DENIED. The Clerk shall enter judgment in favor of Respondent and close the file.

Dated:   10 - 22 - 07

JEFFREY S. WHITE
United States District Judge

United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

JONES,

          Plaintiff,

  v.

GALAZA,

          Defendant.

_____/

Case Number: CV03-00079 JSW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on October 22, 2007, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Linda Marie Murphy
Attorney at Law
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102

Michael L. Jones
 P-61611
P.O. Box 4000
Gym Dorm 120 Low
Vacaville, CA 95696-4000

Dated: October 22, 2007

Richard W. Wieking, Clerk
By: Brenda Tolbert, Deputy Clerk